**Date signed January 04, 2005**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
at Greenbelt

|  |  |  |
|---|---|---|
| **In Re:** | * | |
| **WestLake Internet Training, Inc.,** | * | |
| | * | |
| | * | |
| **Debtor.** | * | |
| ************************************** | * | |
| **WestLake Internet Training, Inc.,** | * | Adv. Proc. No.    04-1005 |
| | * | |
| | * | |
| **Plaintiff,** | * | |
| vs. | * | |
| **David Zimmer,** | * | |
| | * | |
| | * | |
| **Defendant.** | * | |

_____
PAUL MANNES
U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION

    This adversary proceeding was commenced by a complaint filed by Plaintiff WestLake Internet Training, Inc. (the Debtor) on January 5, 2004, entitled Complaint Seeking Judgment Against David Zimmer. The trial was held on December 2, 2004. The case was tried for the most part as a document case, as David Zimmer did not testify on his own behalf. Plaintiff's lone witness, Mark Rogers, who became president of the Debtor in 2002, was a credible witness. At the conclusion of the trial, the parties were invited to submit proposed findings of fact and conclusions of law, but only the defendant's attorney accepted the invitation.

Facts

    Defendant David Zimmer ("Zimmer") was hired as chief financial officer of WestLake Internet Training, Inc. ("Westlake") in January 1999. WestLake's offer letter to Zimmer stated that his initial annual salary would be Fifty Six Thousand Dollars ($56,000). [**Pl. Ex. 1**]. According to the

employment agreement entered into between WestLake and Zimmer, Zimmer was to "be compensated in accordance with the terms set forth in [his] Offer Letter." [**Pl. Ex. 2**]. The employment agreement further provides that "[t]he parties may from time to time agree in writing to changes in the Employee's compensation."

Zimmer was given two performance reviews during his tenure at WestLake. The first review, which occurred in January 2001, authorized an increase in his salary to One Hundred Ten Thousand Dollars ($110,000), and a second review, the date of which was not specified, authorized an increase to One Hundred Fifteen Thousand Dollars ($115,000). [**T.26**] Due to WestLake's faltering financial performance, however, a decision was made in December 2002 to reduce the salaries of its employees and officers (including Zimmer) and thus Zimmer's salary was never increased to the authorized amount.

On January 16, 2003, WestLake filed a petition for relief under Chapter 11 of the Bankruptcy Code (Case No. 03-10607). As of February 1, 2003, Zimmer's authorized salary was Seventy One Thousand Eight Hundred Dollars ($71,800). [**Def. Ex. 5**] From this time until the date of his termination, however, Zimmer was paid at an annual salary of approximately One Hundred Twenty Two Thousand Dollars ($122,000).

On October 29, 2003, Zimmer was informed that he had been placed on official administrative leave of absence for an indeterminate amount of time via a letter from the President of WestLake, Mark Rogers. [**Def. Ex. 2**]. This letter also indicated that Zimmer would receive bi-monthly severance pay for 90 days equal to Five Thousand Dollars ($5,000) per month. But, by letter dated November 11, 2003 from Gregory Eoyang, the founder and chairman of WestLake, Zimmer was told that he was not entitled to severance pay due to the allegedly unauthorized salary increase he received. In relevant part, the letter stated:

> Beginning February 2003 your authorized salary was $71,800 per year or $5,983.33 per month. You were actually paid, however, at an annual rate of $122,085.80 or $10,173.82 per month. From February through October 2003, you were authorized to receive $53,849.99 in salary; in fact, you have received $91,564.38 or $37,714.39 that was unauthorized. Since this amount exceed[s] your severance package of $35,900, Westlake will not issue severance checks to you and you will owe to WestLake a total of $1,814.39. Pending bankruptcy court approval, WestLake will forgive this debt if you execute the enclosed Release and return the original to

WestLake immediately.

**[Def. Ex. 5]**. The complaint asserts that the unauthorized salary payments, as well as Zimmer's operation of other business ventures in contravention of his employment agreement with WestLake, gave rise to causes of action in breach of contract, breach of fiduciary duty, and tortuous misappropriation of funds.[1] The complaint also requested an accounting.

Zimmer filed an application for administrative expenses in the bankruptcy case, requesting $35,900 (the amount of severance to which he believed he was entitled) under § 503(b)(1)(A) of the Bankruptcy Code. The court reserved its decision on its application pending the result of the trial in this adversary proceeding.

### Discussion

Zimmer's principal argument is that he did not agree to the salary reduction in writing and so he was entitled to an additional $37,717.00 in salary. Therefore, his receipt of this money was not unauthorized and could not serve as a basis for this cause of action. Therefore, inasmuch as did not take anything that did not belong to him, he breached neither the employment agreement nor his common law fiduciary duty and the conversion claim and accounting claim are without merit. Zimmer further asserts that it was WestLake that breached the employment agreement by not putting the salary reduction in writing.

This court disagrees with Zimmer's characterization of events. Evidence presented at trial supports the conclusion that the reduction in salary was presented to Zimmer in written form and that he took action to implement the new salary structure. Zimmer was copied on a December 4, 2003 email

---

[1]In its complaint, Westlake set forth two other bases for the asserted causes of action. Westlake alleged that Zimmer made an unauthorized and unlawful application to the U.S. Department of Housing and Urban Development ("HUD") for a rehabilitation grant, causing Westlake to receive a grant of $150,000. In connection with this grant application, Zimmer paid to himself a $10,000 "processing fee", which fee was unauthorized. Furthermore, the complaint also alleged that Zimmer, without authorization, enrolled his father on Westlake's health insurance plan, causing Westlake to pay $2,875 in insurance premium for his father's health insurance.
In its pretrial statement, Westlake abandoned the issue of the $10,000 processing fee in connection with the HUD grant application. At trial, Westlake agreed to proceed with only the unauthorized salary issue, abandoning the remainder of the HUD grant application issue as well as the unauthorized insurance premium issue. **[T.10]**

from Florence Schlanger, former chief operating officer of WestLake, to Eoyang, which included a table setting forth the salaries of WestLake's employees.  According to this table, Zimmer's annual salary in 2003 was to be $71,800 ($5,983/month).  [**Pl Ex. 8**]  Several days later, on December 10, 2002, Zimmer sent an email to payroll personnel, the subject line of which read "new salaries".  The list attached to this email indicated that Zimmer's salary was $71,800.  [**Pl Ex. 24**]  At trial, Mark Rogers testified that this document was "official" and served to authorize payroll to make the salary adjustments [**T.19-T.20**]   Given that it was Zimmer who circulated information regarding the salary reductions, it makes little sense for him to argue now that he never agreed to this change in compensation.

Having concluded that Zimmer did, in fact, agree to the salary reduction (or "deferment" as Zimmer has characterized it), the question then becomes whether Zimmer was entitled to disregard that agreement and pay himself an increased salary.  There is no evidence that Zimmer reached a subsequent agreement with Eoyang and/or Rogers regarding an increase in salary.  Zimmer argues that the fact that "management was apparently unaware of the payment" is of little importance.  *See* Defendant's Proposed Findings of Fact and Conclusions of Law, at 3.  The employment agreement, however, does not contemplate Zimmer uniliaterally determining the rate at which he should be paid.

Nowhere in the employment agreement is it contemplated that Zimmer could unilaterally determine his salary.  What the agreement did contemplate, however, was that Zimmer would "utilize his ... best efforts to promote [WestLake's] best interests and to discharge his or her designated duties in an efficient, trustworthy and professional manner."

 This court finds that Zimmer failed to act in the manner required of him pursuant to the employment agreement when he devised and implemented a plan to pay himself an increased salary.  At trial, Rogers testified regarding a series of email exchanges between Zimmer and Schlanger.  These communications, when read together, present an ongoing dialogue regarding different means for them to get the money that they did not receive due to company-wide salary reductions.  Over the course of several days (December 18, 2002 - December 20, 2002), Zimmer and Schlanger discussed the pros and cons of paying themselves with money from a government contract that WestLake expected to receive [**Pl. Ex. 11**] or, alternatively, running the payments through payroll. [**Pl. Ex. 12**].  On February 16, 2003, Zimmer and Sclanger once again discussed their repayment plan via email.  Schlanger writes, "So do we want to proceed with our plan for repayment or [sic] our loan?" and then proceeds to

answer her own question: "I think we should ... because even with this boost the future is shakey [sic] so I think we should get what we are entitled to as quickly as possible." In response, Zimmer forwards to Schlanger a spreadsheet detailing the specifics of the plan, namely 1) Zimmer's "stated salary" is $110,000, 2) the pay cut Zimmer took between August 2001 and November 2002, which totals $29,333.33, would be paid back over seven months so that between February 15, 2003 and September 15, 2003, Zimmer would receive an additional $4,190.48 monthly, and 3) commencing on September 30, 2003, Zimmer monthly salary would be decreased to $5,983.33 (based upon an annual salary of $71,800).

Evidence presented at trial establishes that the "repayment plan" formulated by Zimmer and Schlanger was implemented. For example, Plaintiff's Exhibit No. 23 is a spreadsheet which shows that, from February 15, 2003 until his termination, Zimmer received $10,173.82 per month. The spreadsheet was prepared from the actual pay stubs and records of payment.

At trial, Rogers summarized the information provided in the spreadsheet:

> From August of 2000 ... [Zimmer] was paid at an annual rate of what would appear to be start at $67,500 and progressed up through about $90,000 per year until October 2001, when his compensation appeared to have gone down to $86,000 and then down to about $81,000 a year. It stayed at $81,000 a year up until May of 2002, when it was brought back up to $87,000 a year, roughly, until February of 2003, when it jumped to $122,000 a year."

[**T.16**] Zimmer's sudden salary jump in February 2003 is also reflected in the federal quarterly summary and wage analyses, entered into evidence as Plaintiff's Exhibit No. 13. According to these documents, in the first quarter of 2003, Zimmer's gross salary was $21,918; in the second quarter, $37,039.19; and, in the third quarter, $30,521.46.

Evidence presented at trial also established that Zimmer, in implementing the plan, made an effort to conceal the additional payments from WestLake management. Rogers testified as follows regarding an email exchange between Zimmer and Schlanger:

> ....It begins with Florence telling David, "Maybe we should just keep our current salaries." David responds, "Too late." And then David says to Florence, "Also not sure if we can pay ourselves as it is unclear if, by looking at our disbursement, this means     checks written and payroll or just checks written."
>
> Florence responds, "I doubt if they will look at payroll." David responds, "I think

they would look at trends.  So if we're doing it, now is the time to establish it so there    isn't a variance."

[**T.36**] It is highly unlikely that Zimmer would have felt the need to disguise the money that he was paying himself if he truly believed that he was contractually entitled to this money.  The fact that he made such an effort lends support to the conclusion that he knew he was proceeding without proper authority to do so.

Having fully described the facts found by the court as to this dispute, the court will nonetheless dismiss the complaint on the grounds that WestLake's action is barred by the doctrine of collateral estoppel.  Zimmer filed an application for unemployment compensation following the termination of his employment.  WestLake opposed this application on the same grounds presented in this dispute, namely that without any authorization from his employer, Zimmer paid himself the compensation that had been deferred.  This act constituted such a course of unlawful conduct so as to justify his firing and disqualify him from receiving unemployment benefits.  The issue decided in the litigated unemployment appeals decision is identical to that presented to this court - whether Zimmer could cause to be paid to himself the deferred payment.  The Appeals Division of the Department of Labor, Licensing and Regulation found that he was not prohibited from acting as he did.  No disqualification was imposed based upon his termination by WestLake.  No appeal was taken from that decision.

As noted in the case of *In re McNallen*, 62 F.3d 619, 623 (CA4 1999), "[c]ollateral estoppel precludes relitigation of an issue previously in judicial or administrative proceedings provided the party against whom the prior decision was asserted enjoyed a full and fair opportunity to litigate that issue in an earlier proceeding." (citing *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415).  The resolution by the Appeals Division met all of the tests for having a preclusive effect upon subsequent litigation.  *See Batson v. Shiflett*, 325 Md. 684, 701, 602 A.2d 1191, 1200 (1992) (finding that agency decision is entitled to preclusive effect if the agency was acting in a judicial capacity; the issue presented to the court was actually litigated before the agency, and resolution of this issue was necessary to the agency's decision).  The Division was acting in a judicial capacity.  The issue presented to this court is precisely the issue that was litigated before the Division, and resolution of that issue was necessary to its decision.  *See also Stavely v. State Farm Mutual Automobile Ins. Co.*, 376 Md. 108, 117, 829 A.2d 265, 270 (2003) (stating that the principle of collateral estoppel applies

to administrative decisions "'in which ... [the agency] is acting in a judicial capacity and resolves disputed issues ... properly before it which the parties have had an adequate opportunity to litigate.'" (*quoting Woodlawn Area Citizens Ass'n v. Board of Cty. Comr's for Prince George's Cty.*, 241 Md. 187, 194-96, 216 A.2d 149-154-55 (1966) (alterations in original)).

An appropriate order will be entered dismissing Plaintiff's complaint.